UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GUADALUPE CISNEROS, | CASE NO. C17-402 MJP |
| Plaintiff, | ORDER ON SUMMARY JUDGMENT MOTION |
| v. | |
| TRUCKVAULT, INC., et al., | |
| Defendants. | |

The above-entitled Court, having received and reviewed:

1. Defendants' Motion for Summary Judgment (Dkt. No. 27),

2. Plaintiff's Response to Defendants' Motion for Summary Judgment (Dkt. No. 29),

3. Defendants' Reply in Support of Motion for Summary Judgment (Dkt. No. 32),

all attached declarations and exhibits, and relevant portions of the record, rules as follows:

IT IS ORDERED that the motion is PARTIALLY GRANTED: summary judgment is GRANTED on Plaintiff's claim for intentional infliction of emotional distress, and that claim will be DISMISSED with prejudice.

1 IT IS FURTHER ORDERED that the remainder of Defendants' motion is DENIED.

**Background**

Plaintiff was employed by Defendant TruckVault ("TruckVault"), a company which makes and installs safes in vehicles (with a focus on firearm storage). He initially worked for the company as a general Production Group worker from September – November 2011, but was laid off. He was hired again in 2012 as a purchaser in the Production Group, a position which was advertised at $13.25/hour, but for which Plaintiff was initially paid $11.25/hour. Plaintiff was promised a raise and benefits after a 90-day performance review, but did not receive benefits for over 6 months[1] and had to wait 15 months for a performance review and a raise. Plaintiff also alleges that he was required to use his personal cell phone to receive business calls "off the clock," but received no cell phone stipend in exchange.[2]

In June of 2013, Plaintiff failed to show up for work for several days without explanation and was considered to have abandoned his position. He did return, however, and was reinstated in his position without disciplinary action.

TruckVault presents evidence that Plaintiff received a series of raises throughout the course of his employment. In the four years that he worked there, his hourly rate increased $6.75, and by the time he left he was making $14,040 more annually than when he started. (Dkt. No. 28, Pearce Decl., Ex. E.) The company was aware that Plaintiff was unhappy both with his

---

[1] Plaintiff presents evidence that several Caucasian co-workers similarly situated received performance reviews and raises within 2 – 5 months following their hire. Dkt. No. 29, Response at 3.

[2] By contrast, his evidence reveals that no other co-workers received phone stipend during the time he worked for TruckVault (and only one received the stipend after he departed). Dkt. No. 30, Stoessel Decl., Ex. 33.

rate of pay and the timing of his annual reviews, and also presents evidence that Plaintiff was not alone in his dissatisfaction regarding compensation.[3]

The other defendant in the case is Plaintiff's former supervisor, Jeffrey Russell. Defendants concede that Russell "could be perceived as harsh in his interactions with supervisees." (Dkt. No. 27, Motion at 5.) The most striking example of this was an incident involving Plaintiff and another (Caucasian) co-worker wherein Russell told them that he wanted to "shoot [them] in the face." (Pearce Decl., Exs. W and X; Cisneros Decl., ¶ 7.) Plaintiff found this comment particularly threatening because the company, which primarily manufactured gun vaults for vehicles, had guns on the premises. (Cisneros Decl., ¶ 7.) The incident was reported (by the other employee) and Russell was questioned and cautioned about it, but no disciplinary action was taken. (Pearce Decl., Ex. V at 111.[4]) Plaintiff reports four other incidents involving Russell relative to his claims of racial discrimination:

1. In April 2014, Plaintiff was told by a co-worker (Roedell) that Russell, in response to a comment about Plaintiff being away at his uncle's funeral, said that Hispanics like to get together, drink, and party. (Cisneros Decl., ¶13.[5]) This comment was allegedly reported to TruckVault's HR manager (Burn), but Russell was neither questioned nor disciplined for it. (Stoessel Decl., Ex. 5.)

---

[3] The evidence TruckVault presents on this point is from an anonymous survey, however. (Pearce Decl., Ex. V.) There is no way to know if the dissatisfaction was being expressed by Caucasians or employees of color.

[4] There is also evidence that Defendant's Human Resources ("HR") division was told by at least two other employees (Roedell and Kres) about Russell's threatening and bullying behavior. (Stoessel Decl., Ex. 5; Pearce Decl., Ex. BB.) Kres quit and Roedell was eventually terminated; other than Roedell's termination, TruckVault presents no evidence that HR or anyone else in the company's management followed up on these complaints.

[5] Plaintiff reports that, in light of this incident, other comments by Russell to Plaintiff to the effect that he "must have been drinking" when he made some mistake – comments he had previously not taken seriously – took on a racial overtone. Cisneros Decl., ¶ 12-13.

2. Also in 2014, Russell used the words "spic" and "nigger" in an angry tirade directed at Plaintiff. (Cisneros Decl., ¶ 8.)

3. In 2016, Plaintiff witnessed two other co-workers making a joke about carabiners they were working with containing the word "beaner." Russell was present for the incident, and his response to it was to chide Plaintiff for not getting angry and "defend[ing] your people." (Cisneros Decl., ¶ 14.)

4. In April of 2016, Russell showed Plaintiff and other co-workers a video which contained a drunk parrot saying "nigger." Cisneros alleges that Russell laughed about the video, stating "He said 'nigger'!" (Cisneros Decl., ¶ 15.) Burn (HR) testified that Russell told her about the video, but based on his depiction of the event, no investigation was conducted and no disciplinary action ensued. Stoessel Decl., Ex. B (Burn Depo #2), 26:12 – 29:18.

With the exception of complaining about his rate of pay and the irregular scheduling of his performance reviews, Plaintiff brought none of his concerns regarding the incidents cited above to HR or management. (There is no dispute that TruckVault had an anti-harassment policy in place; Pearce Decl., Exs. GG and HH.) He cites two reasons for this: (1) fears about Russell's explosive nature and Russell's warnings about the danger of "going behind his back" and (2) a general perception within the company that anything said about Russell to HR would get back to him and nothing would be done about it. (Cisneros Decl., ¶ 9.)[6]

In May 2016, Plaintiff returned from work after several days off because of poor health. He was called into a meeting with Russell and Burn. Upon being informed that he was being

---

[6] Complaining about Russell was cited as one of the reasons for terminating a co-worker of Plaintiff's (Roedell). (Chandler Depo #1, 81:22-82:4.) Another co-worker (Kres) left the company because of Russell's abusive behavior. (Pearce Decl., Ex. BB.)

disciplined for failing to advise the company that he was staying home sick, Plaintiff resigned. Following his resignation, Plaintiff sent two emails to the company outlining the incidents of racial discrimination and differential treatment he had observed and been subject to. (Cisneros Decl., ¶18; Stoessel Decl., Ex. 30 and 31.) Additionally, there was an exit interview at which Russell acknowledged that no one had been disciplined for the "beaner" incident, that he had behaved inappropriately on occasion and that he knew Plaintiff was "not lying" about the incidents he reported. (Stoessel Decl., Ex. 9.)

Deposition testimony from Russell, Burn and TruckVault owner Al Chandler indicates that Russell was never disciplined for any of these incidents and that (despite HR's recommendation) no training related to racial discrimination or harassment was ever instituted during Plaintiff's tenure at the company or after his departure. (Response at 8.)

**Discussion**

Standard and scope of review

The legal standard governing the granting of summary judgments is well known. Summary judgment is appropriate where the non-moving party lacks competent evidence to establish a *prima facie* case. Ceotex v. Catrett, 477 U.S. 317, 322 (1986). The moving party meets its burden by showing that the non-moving party lacks the requisite evidence; once that showing is made, the burden shifts to the non-moving party to rebut the movant's proof. Id. at 325. Summary judgment is warranted where the non-moving party fails to demonstrate the existence of an element essential to the case on which that party bears the burden of proof. Id. at 322-23. The evidence is viewed in the light most favorable to the non-moving party.

The Court will analyze the state (WLAD) and federal (Title VII) claims as single causes of action. Interpretations of Title VII, § 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-

2(a)(1) (1982) are not binding on Washington courts, but are instructive. Glasgow v. Georgia-Pacific Corp., 103 Wn.2d 401, 406 n.2 (1985). ("Because our discrimination laws substantially parallel Title VII, we may look to federal law for guidance." Washington v. Boeing Co., 105 Wn. App. 1, 8, 19 P.3d 1041, 1045 (2000).) Neither party argues that, while a state cause of action might fail, its federal counterpart survives because of some substantive difference between the two (or vice versa).

Hostile work environment

Hostile work environment by means of racial discrimination is established by proof that:

(1) Plaintiff was subjected to racially related verbal or physical conduct;

(2) Plaintiff did not invite or welcome the conduct;

(3) The conduct was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment and create an abusive work environment.

Reynaga v. Roseburg Forest Prod's, 847 F.3d 678, 686 (9th Cir. 2017).

Plaintiff asserts (and Defendants do not deny) that, because Defendant Russell qualifies as a "manager" within the company (with the power to direct work, hire and fire, set schedules, authorize overtime, and use independent judgment; Robel v. Roundup Corp., 148 Wn.2d 35, 48 (2002)), TruckVault is directly liable for his actions; i.e., there is no need to "impute" liability to TruckVault based on what its management knew or did not know about the behavior to which Plaintiff was subjected (and in any event there is evidence that HR and upper management were at least aware of Russell's abusive management style).

Plaintiff outlines a list of events which he argues were racially related and, in the aggregate, were sufficiently "severe and pervasive" to alter his conditions of employment and render his work environment abusive:

(1) Russell's "shoot you in the face" comment

(2) Russell's "spic/nigger" outburst at Plaintiff

(3) Russell's stereotyping of Hispanics as liking to drink and party

(4) The "carabiners"/"beaners" incident and Russell's redirecting of responsibility for addressing it onto Plaintiff

(5) Russell's sharing of the drunken parrot/"nigger" video and laughing about the fact that the parrot had used that word

(6) Differentials in wages, working conditions and discipline between Caucasian workers and workers of color

(7) TruckVault's failure to address the "well-known fear and specific acts of retaliation" related to Russell

There is case law that the racial comments need not be directed at either Plaintiff's specific ethnic group (Reynaga, 847 F.3d at 688) or at Plaintiff personally (Monteiro v. Tempe Union High School, 158 F.3d 1022, 1033-34 (9th Cir. 1998)) in order to be actionable. Plaintiff provides testimony regarding how the behavior negatively affected his conditions of employment and created a work environment he considered abusive. (Cisneros Decl., ¶¶ 8, 9, 12, 15, 19.)

Defendants attack Plaintiff's examples as insufficient to satisfy the standard for an actionable hostile work environment claim. They describe Plaintiff's litany of events as "stray incidents," and cite one of the Supreme Court's seminal hostile work environment-racial discrimination cases for the proposition that the "mere utterance of an ethnic or racial epithet" is insufficient to satisfy the standard for hostile work environment. Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998). Faragher cites the following factors as determinative of a hostile work environment:

- Frequency

- Severity

- Physically threatening or humiliating

- Unreasonably interfered with work performance

Id. at 787-88.

Defendants point out that, of the list of incidents cited by Plaintiff, only four are directly racially-related – while Plaintiff attributes racial animus to the remainder, Defendants argue that his evidence of discrimination in those instances is circumstantial and speculative at best. Of the four incidents, two occurred in 2014 and two occurred in 2016 – Defendants assert that this "handful" of occurrences hardly equates to the kind of "pervasive" quality necessary to sustain a claim of hostile work environment.

Defendants also assert an affirmative defense which was enunciated in Faragher; namely, where there has (1) been an exercise of reasonable care by the employer to prevent and correct the discriminatory behavior and (2) the employee has "unreasonably" failed to avail himself of the preventative/corrective opportunities provided by the employer, liability will not attach. Id. at 807-08. TruckVault points to (1) its anti-harassment policy and employee handbook with procedures for reporting grievances and (2) Plaintiff's failure to report any harassment of a racial nature until he had resigned as establishing their complete defense to Plaintiff's hostile work environment claims.[7]

---

[7] "The requirement to show that the employee has failed in a coordinate duty to avoid or mitigate harm reflects an equally obvious policy imported from the general theory of damages, that a victim has a duty "to use such means as are reasonable under the circumstances to avoid or minimize the damages" that result from violations of the statute. Ford Motor Co. v. EEOC, 458 U.S. 219, 231, n. 15 (1982) (quoting C. McCormick, Law of Damages 127 (1935) (internal quotation marks omitted). An employer may, for example, have provided a proven, effective mechanism for reporting and resolving complaints of sexual harassment, available to the employee without undue risk or expense. If the plaintiff unreasonably failed to avail herself of the employer's preventive or remedial apparatus, she should not recover damages that could have been avoided if she had done so. If the victim could have avoided harm,

The Court does not find that the facts support Defendants' assertion of this defense, certainly not to the extent that they are entitled to judgment as a matter of law. In the first place, the mere existence of an anti-harassment policy, without more, is insufficient.

> While there is no exact formula for what constitutes a "reasonable" sexual harassment policy, an effective policy should at least: (1) require supervisors to report incidents of sexual harassment, *see* Varner v. Nat'l Super Markets, Inc., 94 F.3d 1209, 1214 (8th Cir. 1996); (2) permit both informal and formal complaints of harassment to be made, Wilson v. Tulsa Junior Coll., 164 F.3d 534, 541 (10th Cir. 1998); (3) provide a mechanism for bypassing a harassing supervisor when making a complaint, Faragher, 524 U.S. at 808; and (4) and provide for training regarding the policy, Wilson, 164 F.3d at 541

Clark v. UPS, 400 F.3d 341, 349-50 (6th Cir. 2005).

Plaintiff presents evidence that there was no written requirement for supervisors to report incidents of harassment or discrimination. (*See* Burn Depo #1, 62:7-63:14.). The HR supervisor acknowledged that there was no training offered on issues of racial discrimination and/or sensitivity during her tenure with the company, not even in the wake of Plaintiff's complaints. (Burn Depo #2, 64-67.[8])

Additionally, Plaintiff's failure to utilize the system which was (theoretically) in place for handling complaints of workplace discrimination must be "unreasonable" for the Faragher defense to apply. Viewing the evidence in the light most favorable to the non-movant, the company's history of failure to investigate and respond to complaints[9], combined with Russell's

---

no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided." Faragher, 524 U.S. at 806-07.

[8] Burn testified to one 2013 training regarding sexual harassment [Burn Depo #1, 45:9-16]; Defendants present no other evidence of any trainings offered to or attended by Russell or anyone else in the company.

[9] Examples of this include (1) company owner Chandler talking with Russell regarding complaints about his explosive, abusive management style, but taking care to label it "not an official warning" (Pearce Decl., Ex. CC), (2) Burn's acknowledgement that no followup investigation was undertaken in the wake of complaints by employees (Kres, Roedell and Plaintiff) regarding Russell (Burn Depo #2, 59:15-18; and Burn Depo #1, 166:8-167:4), and (3)

warnings about "going behind his back" to complain about him constitute factors which explain (i.e., render "reasonable") Plaintiff's reluctance to report the incidents of discriminatory behavior he was encountering. Furthermore, the firing of one of the employees (Roedell) who complained about Russell[10] provided additional disincentive for Plaintiff to avail himself of the company's complaint mechanism.

> The Second Circuit has stated, "there are many reasons why a victimized employee may be reluctant to report acts of workplace harassment, but for that reluctance to preclude the employer's affirmative defense, it must be based on apprehension of what the employer might do," specifically, on a "credible fear that her complaint would not be taken seriously or that she would suffer some adverse employment action as a result of filing a complaint."

Reed v. MBNA Mktg. Sys., 333 F.3d 27, 36 (1st Cir. 2003)(citations omitted.) Plaintiff has made out a case of "credible fear" that his complaints would not be investigated and/or he might suffer some form of retaliation in response. On these facts, Defendants are not entitled to a "Faragher defense" purely as a matter of law.

The circumstances of Plaintiff's case satisfy the criteria for hostile work environment arising out of racial discrimination sufficiently to avoid summary judgment:

- *Frequency*: there are only four incidents of an unquestionably racial nature and one series of events (the delayed and irregular performance reviews to which, Plaintiff's proof establishes, his Caucasian co-workers were not subjected in the same fashion he was)

---

the company failing to follow up and implement the "action plan" suggested by the company TruckVault hired to conduct a "morale survey" of its employees. (Burn Depo #1, 49:25-50:3.)

[10] *See* Stoessel Decl., Ex. D, Chandler Depo at 81:22-82:4, where the owner testified that he was familiar with the "continuous complaining of Joe Roedell and his efforts to tear down TruckVault and Jeff Russell, which led me – continued to lead me to believe that he needed to be fired, which he eventually was by me."

which are arguably racially discriminatory over the course of four years. However, gaps of time do not necessarily defeat hostile work environment claims:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct… [which] occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

AMTRAK v. Morgan, 536 U.S. 101, 115 (2002)

- *Severity*: Defendant Russell's "spic/nigger" tirade can fairly be characterized as "severe." The "shoot you in the face" outburst, while not directly racial in nature (the comments were also directed at a white co-worker), is certainly severe and can be reasonably viewed as part of the "hostile" work environment in which Plaintiff was attempting to function.
- *Physically threatening or humiliating*: The "shoot you in the face" outburst is unquestionably threatening – again, while not overtly racial, it can be viewed cumulatively as part of Plaintiff's hostile work environment. A jury could reasonably find every other incident which Plaintiff alleges to be "humiliating."
- *Unreasonably interfered with work performance*: Plaintiff's own testimony (*see* Cisneros Decl., ¶ 19) establishes the extent to which being subjected to this behavior in an environment where he felt unsafe to report the conduct contributed to Plaintiff's poor physical, emotional and mental health.

On this basis, Defendants have failed to establish that they are entitled to summary judgment of dismissal of Plaintiff's hostile work environment claims as a matter of law, and the motion will be denied in that regard.

Constructive Discharge

The elements of this claim require proof that:

   (1) An employer "deliberately made the employee's working conditions intolerable"

   (2) A reasonable person would have resigned under those conditions

   (3) The employee resigned solely because of the intolerable conditions

   (4) The employee suffered damages as a result

Crownover v. Dept. of Transportation, 165 Wn.App. 131, 145 (2011). The presumption is that a resignation is voluntary; that presumption is rebutted by demonstrating "objective" duress, not simply an undesirable situation or subjective dissatisfaction. Lee v. Rite Aid Corp., 917 F.Supp.2d 1168, 1173-74 (E.D.Wa. 2013).

     Defendants cite the absence of any "contemporaneous" complaints about working conditions as proof that Plaintiff did not resign "solely" because of intolerable conditions on the job. They cite no legal support for that contention and the Court is not persuaded. Even if Plaintiff had not provided the wealth of evidence regarding his reasons for failing to come forward with all his problems on the job, that is at best weakly circumstantial evidence that the allegedly intolerable conditions weren't the cause of his departure (inability to safely or effectively complain about the circumstances could well be one of the "intolerable conditions"). Additionally, Plaintiff did complain – repeatedly – about one of the conditions; namely, TruckVault's repeated refusal to offer him regular and timely performance reviews.

     One thing that should be noted about the elements of this claim is that the "intolerable conditions" do not have to be racial in nature; i.e., for purposes of this cause of action, it does not matter if the irregular performance reviews or Russell's "shoot you in the face" comment were racially related. The only threshold issue is: were they objectively intolerable? Plaintiff lists all

the hostile work environment factors mentioned *supra* as the circumstances which created the "intolerable conditions:"

- The lack of effort to address or ameliorate the "shoot you in the face" comment, and the general tolerance for Russell's abusive and threatening behavior
- Being subjected to racial slurs in a tirade by a supervisor, as well as a racially-offensive video
- Failure to investigate allegations of racial hostility to Plaintiff (the "drinking/partying" comments which were reported to them by Plaintiff's co-worker)
- Placing the responsibility on Plaintiff to address racially derogatory comments by his co-workers
- Disparate treatment as regards his performance reviews[11]

Defendants respond – as regards the performance review issue – that Plaintiff presents no proof that he was the only one denied regular performance reviews. First of all, that is not the case – as mentioned *supra*, Plaintiff does have evidence that several white co-workers received timely performance/probationary evaluations where he had to wait 15 months. Secondly, "intolerable is intolerable" – it does not matter if Plaintiff was the only one subjected to these conditions, or the only one who quit because he was subjected to these conditions. If a jury could reasonably find them "intolerable," there is no requirement that Plaintiff have been the only employee who experienced them.

Plaintiff argues that the cumulative effect of these conditions amounts to strong circumstantial evidence that TruckVault "deliberately created" the conditions which rendered his

---

[11] Plaintiff makes a similar claim as regards his pay, but presents little or no evidence that his Caucasian co-workers were paid more than he was for comparable work.

job intolerable. The Court finds that he has presented sufficient evidence upon which a jury could reasonably find that he had satisfied the conditions for a constructive discharge claim, and on that basis he should be allowed to proceed.

Defendants' request for summary judgment of dismissal of Plaintiff's constructive discharge claims is denied.

§1981 Claim

The analysis for this is comparable to the hostile work environment analysis *supra*. The case cited by Defendants for the elements of the claim holds the proof is the same under Title VII or § 1981:

> To establish the prima facie hostile work environment claim under either Title VII or § 1981, [Plaintiff] must raise a triable issue of fact as to whether (1) she was "subjected to verbal or physical conduct" because of her race, (2) "the conduct was unwelcome," and (3) "the conduct was sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive work environment."

Manatt v. Bank of Am., 339 F.3d 792, 798 (9th Cir. 2003)(citation omitted).

With that in mind, the Court finds further analysis unnecessary. As the hostile work environment claims under Title VII survive summary judgment, so do the § 1981 claims.

Wrongful Discharge

The evaluation of this claim under the facts of this case has presented some challenges. Although Plaintiff cites case law that the "wrongful discharge" may be either "express or constructive" (Snyder v. Medical Services Corp. of E.Washington, 145 Wn.2d 233, 238 (2001)), neither side explains how the elements of the cause of action can be applied to a constructive discharge situation, or cites any case law where the tort was upheld as regards a constructive discharge.

The full name of the tort is "wrongful discharge against public policy"[12] and proof of it requires a court to examine:

> (1) the existence of a "clear public policy" (clarity element), (2) whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" (jeopardy element), (3) whether the "public-policy-linked conduct caused the dismissal" (causation element), and (4) whether the employer is "able to offer an overriding justification for the dismissal" (absence of justification element).

Rose v. Anderson Hay & Grain Co., 184 Wn.2d 268, 277 (2015).

(1) *A clear public policy*: Both in statutes and case law, a clear public policy against racial discrimination is evident.

(2) *Whether "discouraging the conduct in which [the employee] engaged would jeopardize the public policy" (jeopardy element)*: "The conduct in which the employee engaged" is Plaintiff's resignation from his position. No court would want to discourage employees who are being subjected to racial discrimination/harassment and have no reasonable means to address that deplorable treatment within their company from leaving the job (as opposed to staying and just putting up with the discriminatory behavior). That certainly would defeat the public policy of eliminating discrimination in the workplace.

(3) *Whether the "public-policy-linked conduct caused the dismissal" (causation element)*: The Court finds the "public-policy-linked conduct" to be the behavior in Defendants' workplace which motivated Plaintiff's "constructive discharge;" i.e., the reasons why he felt he had to leave.

(4) *Whether the employer is "able to offer an overriding justification for the dismissal" (absence of justification element)*: Defendants have certainly proffered explanations and

---

[12] Although Plaintiff does not specifically call it by its full name in his complaint, his "Sixth Claim for Relief: Tort of Wrongful Discharge" alleges the "jeopardy to public policy" elements which are required to establish 'wrongful discharge against public policy." (Dkt. No. 1, Complaint, pp. 14-15.)

defenses to Plaintiff's allegations that Defendant Russell's conduct and the treatment which Plaintiff received while employed at TruckVault do not amount to actionable discrimination. The Court has found that, for purposes of this motion, those justifications are inadequate to entitle them to summary judgment.

Summary judgment dismissing Plaintiff's wrongful discharge claim will be denied.

Intentional Infliction of Emotional Distress (Outrage)

The elements of this cause of action are:

(1) Extreme and outrageous conduct

(2) Intentional or reckless infliction of emotional distress

(3) Severe emotional distress experienced by Plaintiff

Dicomes v. State of Washington, 113 Wn.2d 612 (1989).

> "[The conduct must be] beyond all possible bounds of decency… atrocious and utterly intolerable in a civilized community… [M]ere insults, such as causing embarrassment or humiliation, will not support the imposition of liability…"

Id. at 630-31.

Without minimizing the treatment which Plaintiff endured during his four years at TruckVault, it simply does not rise to the requisite level of "atrocity," "beyond all possible bounds of decency." The fact that Plaintiff worked at TruckVault for four years before finally deciding he had had enough, combined with the fact that the incidents were arguably the most outrageous (Defendant Russell's "shoot you in the face" tirade and "spics and niggers" outburst) took place two years before he left, leave the Court with little option but to rule that this is simply not, as a matter of law, tortiously outrageous behavior.

Defendants' request for summary judgment dismissing the intentional infliction of emotional distress claim is granted.

Wage Claims

Claims 8, 9, and 10 all concern the same allegation; namely, that on many occasions Plaintiff worked sufficient hours that, under Washington labor law, he should have been given a second 30-minute meal period. He seeks damages for those uncompensated meal periods from TruckVault only.

TruckVault's defense seems to be that Plaintiff cannot recover because he did not make a claim for the uncompensated time prior to filing his lawsuit. The case law it cites for this proposition, however, does not support its position. TruckVault cites Forrester v. Roth's IGA Foodliner, Inc., 646 F.2d 413 (9th Cir. 1981) for the holding that an employee who does not make a claim for unpaid wages or prevents his employer from discovering that he has worked unpaid hours cannot later recover from that employer. But Defendant has plucked that language out of context, and the full holding is not favorable to its defense:

> However, *where an employer has no knowledge that an employee is engaging in overtime work* and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation…

Forrester, 646 F.2d at 414 (emphasis supplied).

TruckVault had access to Plaintiff's timesheets (Plaintiff acknowledges that he was paid for all the hours he claimed, so obviously the timesheets were being reviewed) and was in just as good a position as Plaintiff to evaluate whether the amount of time he was working entitled him to the second 30-minute meal period (which is mandatory; *see* WAC 296-126-092). Earlier on in the Forrester opinion, the court says:

> An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for the overtime compensation.

Id. The burden is clearly on the employer, not the employee, to comply with the state's compensation regulations.

Defendant also misquotes a Washington appellate court opinion in support of an argument that

> [i]f the workers were paid for all hours worked during a shift and there were no deductions for meal periods, an employer should not be required to pay twice for the same meal periods simply because formal meal breaks were not scheduled. Id. Unscheduled or interrupted meal breaks do not support additional payment to an already compensated employee.

Motion at 23 (*citing* White v. Salvation Army, 118 Wn.App. 272, 280-81 (2003)). What Defendant neglects to quote is the portion of that ruling that says that no compensation is owing where the breaks were provided "consistent with the requirements of WAC 296-126-092.2." White, 118 Wn.App at 281. Plaintiff's argument is precisely that the breaks were not provided "consistent with the requirements of WAC 296-126-092.2."

TruckVault's final argument appears to be that Plaintiff has not established his loss with sufficient certainty to be entitled to recovery – "speculative" or conjectural claims are not recoverable. (Motion at 24.) But Plaintiff provides a fairly precise estimate of the number of uncompensated meal breaks during his employment with TruckVault ("61 missed meal periods and 12 otherwise late meal periods;" Response at 24), along with backing documentation. (Stoessel Decl., Ex. 53.)

Defendant is not entitled to summary judgment on Plaintiff's wage claims.

## Conclusion

While the material facts of this matter do not appear (for the most part) to be in genuine dispute, the legal impact of those facts is a matter for jury determination. With the exception of Plaintiff's claim for intentional infliction of emotional distress, Defendants have failed to establish that they are entitled to dismissal of Plaintiff's complaint as a matter of law. The remainder of their summary judgment motion is, therefore, denied.

The clerk is ordered to provide copies of this order to all counsel.

Dated September 11, 2018.

The Honorable Marsha J. Pechman
United States Senior District Court Judge